UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RYAN AVARITT,                     :
                                  :CIVIL ACTION NO. 3:17-CV-1444
          Plaintiff,              :
                                  :(JUDGE CONABOY)
          v.                      :
                                  :
NANCY A. BERRYHILL,               :
Acting Commissioner of            :
Social Security,                  :
                                  :
          Defendant.              :
                                  :

_____

**MEMORANDUM**

Pending before the Court is Plaintiff's appeal from the
Commissioner's denial of Disability Insurance Benefits ("DIB")
under Title II of the Social Security Act ("Act") and Supplemental
Security Income ("SSI") under Title XVI of the Act.  (Doc. 1.)
Plaintiff protectively filed applications on July 11, 2014,
alleging disability beginning on March 12, 2013.  (R. 16.)  He
later amended the onset date to June 14, 2014.  (*Id.*)  After
Plaintiff appealed the initial October 3, 2014, denial of the
claims, a video hearing was held on December 14, 2016, and
Administrative Law Judge ("ALJ") Patrick S. Cutter issued his
Decision on March 9, 2017, concluding that Plaintiff had not been
under a disability as defined in the Act from June 14, 2014,
through the date of the decision.  (R. 16-27.)  Plaintiff requested
review of the ALJ's decision which the Appeals Council denied on
July 20, 2017.  (R. 1-6.)  In doing so, the ALJ's decision became
the decision of the Acting Commissioner.  (R. 1.)

Plaintiff filed this action on August 3, 2017. (Doc. 1.) He asserts in his supporting brief that the Acting Commissioner's determination is error for the following reasons: 1) the residual functional capacity assessment is not supported by substantial evidence; 2) the ALJ did not properly evaluate Plaintiff's obesity; 3) the ALJ did not properly weigh opinion evidence; 4) substantial evidence does not support the ALJ's finding that Plaintiff's severe spine impairment does not meet or equal listing 1.04A; 5) the ALJ's multiple errors with symptoms evaluation require reversal; and 6) substantial evidence does not support the ALJ's step two evaluation. (Doc. 10 at 1-2.). For the reasons discussed below, the Court concludes Plaintiff's appeal is properly granted.

## I. Background

Plaintiff was forty-five years old on the amended alleged onset date of June 14, 2014. (R. 26.) He has at least a high school education and past relevant work as a cashier, grocery clerk, fast food worker, and nurse assistant. (R. 25-26.) Plaintiff alleged that his inability to work was limited by chronic COPD, bipolar disorder, major depressive disorder, lower back pain, and arthritis. (R. 245.)

### A. Medical Evidence[1]

### 1.  Physical Impairments

Preceding the alleged onset date of June 14, 2014, Plaintiff

---

[1]  The following review focuses on those impairments and evidence related to Plaintiff's claimed errors.

was seen by his primary care provider Thomas P. Kunkle, D.O. On February 25, 2014, Dr. Kunkle noted that Plaintiff had extreme lower back pain from slipped and bulging discs, he had a history of degenerative disc disease, and he had not been on any pain medications for the previous year but wanted something for pain. (R. 442.) On March 25th, Dr. Kunkle recorded that Plaintiff had severe edema on his ankles and his back was about the same. (*Id.*) Dr. Kunkle planned to arrange physical therapy. (*Id.*)

Plaintiff began physical therapy at the Drayer Physical Therapy Institute in May 2014. (R. 427.) Records indicate that Plaintiff presented with lumbar spine pain, resultant immobility and activity of daily life limitations. (R. 427.) Plaintiff attended several physical therapy sessions in May and June (*see*, *e.g.*, 395-413), ultimately reporting no improvements in his pain level (R. 399). On June 20, 2014, Plaintiff was assessed to have significant pain symptoms and difficult mobility. (*Id.*) At his June 27th appointment the therapist noted that Plaintiff was unable to progress due to his pain level. (R. 395.)

Plaintiff saw Dr. Kunkle on July 9, 2014, and reported that physical therapy was not working. (R. 435.) In August, Plaintiff requested that Dr. Kunkle complete disability forms. (R. 443.)

On September 29, 2014, Spencer Long, M.D., conducted an internal medicine examination at the request of the Bureau of Disability Determination. (R. 464-67.) Dr. Long noted Plaintiff

had lower back pain for over ten years which had gradually gotten worse. (R. 464.) He recorded that MRI showed a slipped disc at L4-L5 and previous treatment with pain management and nerve stimulation did not work. (*Id.*) Physical examination showed that Plaintiff was

> obese, slow moving, depressed appearing [and] uncomfortable. He walks with assistance of a cane and a limp. He cannot walk on heels or toes. He cannot squat. Stance normal. He uses a cane. Needed no help changing for exam or getting on and off exam table. Able to rise from chair without difficulty.

(R. 466.) Other than hip and buttock pain bilaterally with single leg raise to thirty degrees, systems evaluation was normal. (R. 466-67.) Dr. Long's diagnoses included lower back pain, degenerative disc disease, and arthritis of the hips and knees. (R. 467.)

Lumbosacral spine x-ray of September 30, 2014, showed degenerative changes, spondylolisthesis, and an old compression fracture. (R. 468.)

In August 2015, Plaintiff told Dr. Kunkle that he wanted to talk about trying to make his back and hips better. (R. 606.) On physical examination, Dr. Kunkle noted that Plaintiff was generally alert and healthy. (R. 607.) His diagnoses included generalized osteoarthritis, and he planned to send Plaintiff to an orthopedist. (*Id.*) Nursing Notes from the office visit indicate that Plaintiff reported his pain medication was not working and he was having

trouble walking.  (R. 614.)

On October 1, 2015, Plaintiff saw Eric Kutz, D.O., of
Arlington Orthopedics for left hand pain, numbness and tingling.
(R. 490-91.)  Evaluation of the left hand showed positive Tinel's
test at the wrist and elbow, 4/5 grip strength, and diminished
sensation.  (R. 490.)  Dr. Kutz diagnosed carpal tunnel syndrom and
cupital tunnel syndrome.  (R. 491.)  He recommended left cupital
tunnel and carpal tunnel release.  (*Id.*)  The procedures were done
on October 7, 2015.  (R. 484-85.)  At his October 22, 2015, post-
operative visit with Dr. Kutz, Plaintiff presented with pain (rated
at 10/10) and swelling on the left side.  (R. 487.)  He reported
that symptoms were aggravated by daily activities.  (*Id.*)  Physical
examination of the left wrist showed decreased active range of
motion and limited strength.  (R. 488.)  Plaintiff was referred to
physical therapy and advised to resume activity as tolerated.
(*Id.*)

At his October 25, 2015, office visit for a refill of pain
medications, Dr. Kunkle's physical examination was unremarkable
other than noting obesity and healing surgical scars.  (R. 618.)
Dr. Kunkle noted that the orthopedic surgeon had referred Plaintiff
to a pain center.  (*Id.*)  Plaintiff was referred to Select Physical
Therapy where he tolerated his initial November 12, 2015, treatment
with minimal complaints of pain.  (R. 495-96.)  Plaintiff
subsequently missed at least two therapy appointments.  (R. 493-

94.)

Plaintiff was seen by Paul Ritenour, D.O., at the Fourth and Diamond Medical Clinic on September 7, 2016. (R. 646.) At this initial visit, Plaintiff subjectively reported that he was generally healthy. (R. 646.) Physical examination did not reveal any musculoskeletal problems, and Dr. Ritenour noted that he would recheck Plaintiff in two weeks. (R. 646.)

Records indicate that Dr. Ritenour referred Plaintiff to the Mansfield Pain Clinic where Plaintiff had his initial visit with Ali Rao, M.D., on September 16, 2016. (R. 647.) Physical examination showed that Spurling and Hoffman tests were negative bilaterally, cervical facet tenderness was positive bilaterally, straight leg raise was positive on the right, lumbar facet tenderness was positive bilaterally, and lumbar facet loading test was positive bilaterally. (R. 650.) Dr. Rao diagnosed the following: radiculopathy of the cervical region, spondylosis of the cervical region, other cervical disc degeneration, radiculopathy of the lumbar region, spondylosis of the lumbosacral region, spinal stenosis of the lumbar region, other interverebral disc degeneration of the lumbar region, and other vertebral disc displacement of the lumbar region. (R. 651.) Dr. Rao prescribed Percocet for moderate to severe pain, Topamax for neuropathic pain, and Flexeril for muscle cramps/spasms. (*Id.*) He also recommended bilateral lumbar medial branch blocks. (*Id.*)

Dr. Ritenour saw Plaintiff again on September 20, 2016, and recorded no objective problems. (R. 645.) As with the previous visit, back examination revealed no tenderness, and Plaintiff had free range of motion of his extremities and no deformities, edema or erythema. (*Id.*)

At his October 18, 2016, visit with Dr. Rao, Plaintiff received lumbar facet injections to address lumbar spondylosis and lumbar degenerative disc disease. (R. 658.) At his November 1st visit, Plaintiff did not have the scheduled second injections because the first had not helped. (R. 665.) Plaintiff continued to report pain in his neck, low back, hips, and knees. (R. 663.)

December 8, 2016, x-ray of the lumbar spine showed degenerative disc disease with a grade 1-2 spondylolisthesis L5 on S1. (R. 667.)

2. **Mental Impairments**

Plaintiff was seen by providers including Maribeth Bucher, CRNP, at Holy Spirit Hospital in Camp Hill, Pennsylvania, preceding his amended alleged onset date of June 14, 2014. On March 13, 2014, she noted no problems in her mental status examination and specifically stated that Plaintiff was in a much better frame of mind. (R. 367.) No mental status findings were recorded in May or July 2014. (R. 366, 432.)

At his September 30, 2014, visit to Holy Spirit, fair hygiene, blunted affect, and anxious/depressed mood were noted. (R. 515.)

7

Mental status examination was otherwise normal.  (*Id.*)  His exam
was similar in October but in November his mental status exam was
normal other than the notation of fair hygiene.  (R. 513, 514.)
Blunted affect and depressed mood were again noted in February
2015.  (R. 509.)  Records indicate that Plaintiff was "no show" for
his April and June 2015 visits.  (R. 509, 510.)

On September 29, 2014, Michael Caiazzo, Psy. D., performed a
consultative psychiatric evaluation.  (R. 456-60.)  Plaintiff
reported that he was residing with his partner and he had most
recently been employed as a cashier and stocker at a convenient
store for three months but he left because it was too painful.  (R.
456.)  Dr. Caiazzo noted that Plaintiff was cooperative, he used a
cane, and wore a back brace.  (R. 457.)  Mental status examination
revealed the following: Plaintiff's thought process was coherent
and goal directed; his affect was of full range and appropriate in
speech and thought content; his mood was euthymic; his attention
and concentration were impaired due to nervousness; his recent and
remote memory skills were impaired due to nervousness; his
cognitive functioning was average; and his insight and judgment
were fair.  (R. 458.)  Dr. Caiazzo stated that the results of the
evaluation appeared to be consistent with psychiatric problems
which could significantly interfere with Plaintiff's ability to
function on a daily basis.  (R. 459.)  He recommended that
Plaintiff continue with medication management and that he receive

weekly outpatient therapy.

On March 26, 2016, Plaintiff sought emergency treatment at OhioHealth Hospitals in Mansfield, Ohio, because he was "severely depressed" and suicidal. (R. 522.) Plaintiff reported he had relocated to Ohio from Pennsylvania in November 2015 and had not taken any psychiatric medications since then. (*Id.*) Mental status examination showed that Plaintiff was alert and oriented to time, place, and person; his hygiene, dressing, and grooming were unkempt; his mood was irritable with congruent affect; he reported recurrent intrusive thoughts of suicide and wanting to take an overdose but also stated he did not intend to take an overdose or do anything to hurt himself; his attention span was poor; his memory for recent and immediate events was poor; his IQ was average as was his general fund of knowledge; and his insight and judgment were poor. (R. 523.) Major depression, recurrent, severe, and noncompliance with treatment were diagnosed. (*Id.*) Inpatient treatment was recommended by the consulting physician and it was estimated that he would be hospitalized for five to seven days. (R. 524, 540.) On March 27th Plaintiff demanded to go home and he reported that he had not gotten his pain medication. (R. 531.) Notes of the same date indicate Plaintiff had not had any narcotic pain medication since he moved to Ohio. (*Id.*) Plaintiff was discharged on March 30, 2016, with improved mental status examination. (R. 525.) Plaintiff was counseled about the

importance of medication and appointment compliance.  (*Id.*)

Following his hospital discharge, Plaintiff had an Initial Psychiatric Evaluation at Catalyst Life Services on April 14, 2016. (R. 570.)  The evaluation was conducted by Debbie Marshall, PMHNP-BC.[2]  (*See* R. 576.)  Plaintiff said he had many life stressors over the preceding three years, he was living with his daughter and her family but was not happy about it, he would be OK if her were on his own, his chronic pain increased his irritability, and he had no income or benefits aside from a medical card and food stamps. (*Id.*)  He noted that one stressor was the death of his partner eighteen months earlier and he had not maintained steady employment or stable housing since then.  (R. 567, 570.)  Plaintiff reported that some of the  medications prescribed during his hospitalization were helping but he still had irritability.  (*Id.*)  He also reported decreased sleep, amotivation, anergia, and crying spells. (*Id.*)  Mental status exam showed average eye contact and activity, clear speech, logical thought processes, cooperative behavior, and no report of impaired cognition.  (R. 573.)  His diagnois was unspecified depressive disorder and unspecified personality disorder.  (R. 575.)  Plaintiff's list of medical problems included a history of diabetes that was controlled by diet at the time of

---

[2] "PMHNP-BC" is the designated title for "Psychiatric-Mental Health Nurse Practitioner--Board Certified." https://nursinglicensemap.com/.../psychiatric-and-mental-health-nurse-practioner-pm.

intake, and a history of hypertension, thyroid dysfunction, heart problems, and diverticulitis.  (R. 572.)

Ms. Marshall saw Plaintiff on April 25th, May 25th, and June 27th, and recorded similar problems with Plaintiff's living situation.  (R. 577, 580, 583.)  He reported no new medical concerns at these visits.  (*Id.*)  On June 27, 2016, Ms. Marshall noted that Plaintiff was pursuing disability, he was "referred for vocational," and hoped to get a part-time job the following week. (R. 583.)

**B.   *Opinion Evidence***

**1.   Physical Ability Opinions**

Dr. Kunkle completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) on August 1, 2014.  (R. 444-47.)  He opined that Plaintiff could never lift or carry any weight; because Plaintiff "needs to lie down" he could sit for one hour and stand/walk for fifteen minutes at one time without interruption and in an eight-hour day he could sit for a total of two hours and stand/walk for a total of thirty minutes; he medically required the use of a cane; and the identified limitations were supported by MRI showing spondylolisthesis at L5-S1.  (R. 444-45.)  Of the identified postural activities, Dr. Kunkle determined that Plaintiff was precluded from all except climbing stairs and ramps which he could only do occasionally.  (R. 446.)  Dr. Kunkle further opined that Plaintiff could perform

activities like shopping, he could travel without a companion for assistance, he was able to ambulate without using a wheelchair, walker, two canes or two crutches, he could not walk a block at a reasonable pace on rough or uneven surfaces, he could use standard public transportation, he could climb a few steps at a reasonable pace with the use of a single handrail, he could prepare a simple meal, care for his personal hygiene, and sort, handle and use paper files. (R. 447.) Finally, Dr. Kunkle noted that the limitations had lasted or were expected to last for twelve consecutive months. (*Id.*)

On the same date, Dr. Kunkle completed a Lumbar Spine Residual Functional Capacity Questionnaire. (R. 448-55.) He found Plaintiff more limited on this form, opining that Plaintiff could only sit for fifteen minutes before needing to get up rather than the one hour previously noted. (R. 445, 449.) Dr. Kunkle noted that surgery was not recommended for the spondyloslisthesis and pain management but orthopedic consult was recommended. (R. 448.) He indicated that Plaintiff had constant low back pain which radiated to both lower extremities, the pain was aggravated by standing and walking, and he had an abnormal gait. (R. 449.) Dr. Kunkle also opined that Plaintiff could continuously use his hands and could use his feet of operation of foot controls occasionally. (R. 454.)

On September 26, 2014, Dr. Long, the consulting examiner,

12

found that Plaintiff had the following abilities: he could frequently lift/carry up to ten pounds, occasionally up to twenty pounds, and never over that due to back and neck pain; he could sit/stand/walk for twenty minutes without interruption and he could sit for six hours total in an eight-hour day and stand/walk for two hours total. (R. 470.) Dr. Long noted that Plaintiff required the use of a cane to ambulate, it was medically necessary, and he could walk ten feet without it. (*Id.*) Regarding the use of his hands, Dr. Long opined that, because of neck pain, Plaintiff could use his hands occasionally for overhead reaching and frequently use them for all other identified activities. (R. 471.) Dr. Long determined that Plaintiff could frequently use his feet for the operation of foot controls, he could occasionally climb stairs/ramps and balance, and he could never perform other identified postural activities. (R. 471-72.) He attributed postural limitations to back pain. (R. 472.) Dr. Long opined that Plaintiff could not perform activities like shopping, travel without a companion, or walk a block at a reasonable pace on rough or uneven surfaces. (R. 474.)

2.  **Mental Impairment Opinions**

On September 29, 2014, Dr. Caiazzo completed a Medical Source Statement to Do Work-Related Activities (Mental). (R. 461-63.) Based on a history of learning support when Plaintiff was a student, Dr. Caiazzo opined that Plaintiff had mild limitations in

13

all areas identified in relation to understanding, remembering, and carrying out instructions.  (R. 461.)  He also found that Plaintiff had marked limitations in the three categories identified related to his ability to interact appropriately with supervisors, co-workers, and the public as well as respond to changes in the routine work setting.  (R. 462.)  Dr. Long stated that these limitations were due to Plaintiff's daily depression and manic symptoms.  (*Id.*)  He noted that the depression began at age eleven or twelve and the mania at age thirty-six.  (*Id.*)

On October 1, 2014, Richard Williams, Ph.D., a non-examining Disability Determination Services psychologist, found that Plaintiff had the severe impairment of affective disorders, mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no repeated episodes of decompensation, each of extended duration.  (*See* R. 81-82.)

Ms. Marshall, a treating provider beginning on April 14, 2016, completed a Mental Impairment Questionnaire on July 12, 2016.  (R. 553-58.)  She identified diagnoses of Depressive Disorder, NOS, and Personaliy Disorder, NOS.  (R. 553.)  She noted that Plaintiff was taking Trazadone, Lexapro, and Risperdal with no side effects reported.  (*Id.*)  She opined that Plaintiff's prognosis was fair with continued treatment, "especially routine psychotherapy as the

bulk of his distress is _situational_." (R. 553.)  She found that Plaintiff experienced the following symptoms: thoughts of suicide; feelings of worthlessness; mood disturbance; emotional withdrawal or isolation; intense and unstable interpersonal relationships; impulsive and damaging behavior; emotional lability; sleep disturbance; and recurrent severe panic attacks.  (R. 554.) Regarding mental abilities and aptitudes needed to do unskilled work, Ms. Marshall found that Plaintiff was unlimited or very good in seven of the sixteen identified categories and was limited but satisfactory in the other nine categories.  (R. 555.)  She also found Plaintiff to be limited but satisfactory in his abilities and aptitudes needed to do semiskilled and skilled work.  (R. 556.) Ms. Marshall opined Plaintiff had at most mild restrictions in his activities of daily living, moderate difficulties in maintaining social functioning and maintaining concentration, persistence or pace, and one or two episodes of decompensation within a twelve month period, each of extended duration.  (R. 557.)

## C.    ALJ Decision

In his March 9, 2017, Decision, ALJ Cutter concluded that Plaintiff had the severe impairments of degenerative disc disease of the lumbar spine, coronary artery disease, osteoarthritis of the hips and knees, obesity, depression, and anxiety.  (R. 18.)  He determined that Plaintiff had the non-severe impairments of diabetes mellitus, migraine headaches, and left carpal tunnel

syndrome.  (R. 19.)  ALJ Cutter found that Plaintiff did not have

an impairment or combination of impairments that met or equaled a

listing.  (*Id.*)

ALJ Cutter determined Plaintiff had the residual functional

capacity to perform sedentary work

> except he can continuously sit.  The claimant
> is limited to occasional standing, walking,
> overhead reaching, bilaterally, climbing of
> ramps and stairs, or balancing.  He can
> frequently reach, handle, finger, feel, push
> and pull bilaterally, and use foot controls
> bilaterally.  The claimant should never climb
> ladders, ropes or scaffolds.  He should never
> stoop, kneel, crouch, or crawl.  The claimant
> should never work at unprotected heights,
> contact moving mechanical parts, or operate
> motor vehicles.  He should never tolerate
> exposure to dust, fumes, gases, temperature
> extremes or vibration.  Furthermore, the
> claimant can perform routine, repetitive one
> to two step type tasks.  He can occasionally
> interact with the public, co-workers and
> supervisors.  The claimant can perform work
> involving occasional changes in work
> situations in routine work settings.

(R. 22.)  In explaining his RFC, ALJ Cutter assigned limited weight

to the opinions of Dr. Kunkle and Dr. Caiazzo.  (R. 25.)  He

assigned significant weight to the opinions of Dr. Williams, Dr.

Long, and Ms. Marshall.  (*Id.*)

After finding that Plaintiff was unable to perform past

relevant work, the ALJ concluded that jobs existed in significant

numbers in the national economy which Plaintiff could perform.  (R.

26.)  He therefore found that Plaintiff had not been under a

disability as defined in the Act from June 14, 2014, through the

date of the decision.  (R. 27.)

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[3]  It is necessary for the Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S.

---

[3]  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

17

521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record. 20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process. *Id.*

The disability determination involves shifting burdens of proof. The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work. If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at step five of the sequential evaluation process when the ALJ found that jobs existed in significant numbers in the national economy which Plaintiff could perform. (R. 26.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision. 42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence means "more than a mere scintilla. It means such relevant evidence

18

as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981). The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise. A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence-- particularly certain types of evidence (e.g., that offered by treating physicians)--or if it really constitutes not evidence but mere conclusion. *See* [*Cotter*, 642 F.2d] at 706 ("'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted). The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.

*Kent*, 710 F.2d at 114.

This guidance makes clear it is necessary for the ALJ to analyze all probative evidence and set out the reasons for his decision. *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119-20 (3d Cir. 2000) (citations omitted). If he has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence

approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979). In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07. However, the ALJ need not undertake an exhaustive discussion of all the evidence. *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . ."). "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d

20

Cir. 1983) (internal quotation omitted).  Where a claimed error would not affect the outcome of a case, remand is not required. *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005).  Finally, an ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision.  *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## IV. Discussion

As set out above, Plaintiff asserts the Acting Commissioner's determination is error for the following reasons: 1) the residual functional capacity assessment is not supported by substantial evidence; 2) the ALJ did not properly evaluate Plaintiff's obesity; 3) the ALJ did not properly weigh opinion evidence; 4) substantial evidence does not support the ALJ's finding that Plaintiff's severe spine impairment does not meet or equal listing 1.04A; 5) the ALJ's multiple errors with symptoms evaluation require reversal; and 6) substantial evidence does not support the ALJ's step two evaluation.  (Doc. 10 at 1-2.).

### A.  *Step Two Evaluation*

Plaintiff asserts that the ALJ's step two evaluation is not supported by substantial evidence because ALJ Cutter determined that his left carpal tunnel syndrome and migraine headaches were non-severe impairments.  (Doc. 10 at 25.)  Though Plaintiff references both impairments, his argument addresses only carpal tunnel syndrome.  (*Id.* at 26-27; Doc. 15 at 1-2.)  Defendant

21

responds that remand on the claimed basis is not warranted because the ALJ proceeded beyond step two and properly considered Plaintiff's work-related functional limitations.  (Doc. 14 at 16-18.)  The Court concludes Plaintiff has not shown that remand is warranted on the basis claimed.

If the sequential evaluation process continues beyond step two, a finding of "nonsevere" regarding a specific impairment at step two may be deemed harmless if the functional limitations associated with the impairment are accounted for in the RFC. *Salles v. Commissioner of Social Security*, 229 F. App'x 140, 145 n.2 (3d Cir. 2007) (not precedential) (citing *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005)).  In other words, because the outcome of a case depends on the demonstration of functional limitations rather than a diagnosis, where an ALJ identifies at least one severe impairment and ultimately properly characterizes a claimant's symptoms and functional limitations, the failure to identify a condition as severe is deemed harmless error. *Garcia v. Commissioner of Social Security*, 587 F. App'x 367, 370 (9th Cir. 2014) (citing *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007)); *Walker v. Barnhart*, 172 F. App'x 423, 426 (3d Cir. 2006) (not precedential) ("Mere presence of a disease or impairment is not enough[;] a claimant must show that his disease or impairment caused functional limitations that precluded him from engaging in any substantial gainful activity.*");* *Burnside v. Colvin*, Civ. A.

22

No. 3:13-CV-2554, 2015 WL 268791, at *13 (M.D. Pa. Jan. 21, 2015); *Lambert v. Astrue*, Civ. A. No. 08-657, 2009 WL 425603, at *13 (W.D. Pa. Feb. 19, 2009).

Plaintiff merely states that he was diagnosed with carpal tunnel syndrome, Dr. Kutz performed a release, and Plaintiff had four occupational therapy sessions following the release. (Doc. 10 at 26; Doc. 15 at 1-2.) He does not identify any functional limitations not addressed at later stages of the sequential evaluation process. (*See id.*) Therefore, Plaintiff has not satisfied his burden of showing harmful error related to the ALJ's finding that his carpal tunnel syndrome was non-severe.

**B.    *Step Three Evaluation***

Plaintiff contends the ALJ erred at step three in that substantial evidence does not support his finding that Plaintiff's severe spine impairment does not meet listing 1.04A. (Doc. 10 at 19.) Defendant responds that the evidence does not document the specific findings required for listing-level severity. (Doc. 14 at 18.) The Court concludes Plaintiff has not shown the ALJ erred on the basis alleged.

Listing 1.04 provides:

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture) resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

23

A.  Evidence of nerve root compression
characterized by neuro-anatomic distribution
of pain, limitation of motion of the spine,
motor loss (atrophy with associated muscle
weakness or muscle weakness) accompanied by
sensory or reflex loss and, if there is
involvement of the lower back, positive
straight-leg raising test (sitting and
supine); or

B. Spinal arachnoiditis, confirmed by an
operative note or pathology report of tissue
biopsy, or by appropriate medically
acceptable imaging, manifested by severe
burning or painful dysesthesia, resulting in
the need for changes in position or posture
more than once every 2 hours; or

C.  Lumbar spinal stenosis resulting in
pseudoclaudication, established by finding on
appropriate medically acceptable imaging,
manifested by chronic nonradicular pain and
weakness, and resulting in inability to
ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, App. 1.

In *Jones v. Barnhart*, 364 F.3d 501 (3d Cir. 2004), the Third
Circuit Court of appeals emphasized that "'[f]or a claimant to show
his impairment matches a listing, it must meet all of the specified
medical criteria.  An impairment that manifests only some of those
criteria, no matter how severely, does not qualify.'"  *Id.* at 504
(quoting *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)).  *Jones* also
stated that there is no particular language or format that an ALJ
must use so long as there is "sufficient development of the record
and explanation of findings to permit meaningful review."  *Id.* at
505.  This principal was applied to Listing 1.04A in *Johnson v.
Comm'r of Soc. Sec.*, 263 F. App'x 199, 202-03 (3d Cir. 2008) (not

24

precedential), where the Circuit Court noted that there was no evidence of motor loss and, thus, the plaintiff did not qualify as disabled under the listing. Similarly, in *Garrett v. Comm'r of Sec. Sec.*, 274 F. App'x 159, 163 (3d Cir. 2008), the ALJ's finding that the claimant did not meet Listing 1.04A was found to be supported by substantial evidence where the plaintiff failed to point to evidence of nerve root compression. Furthermore, as noted in *Hernandez v. Comm'r of Soc. Sec.*, 198 F. App'x 230, 235 (3d Cir. 2006) (not precedential), if the ALJ finds no documentation of required signs, there is nothing more he could have discussed and a plaintiff's complaint of inadequate discussion is without merit.

Here ALJ Cutter specifically considered listing 1.04 and concluded the evidence did not show that Plaintiff met or equaled the requirements of the listing. (R. 19.) In his supporting brief, Plaintiff points to clinical findings of lumbar facet tenderness and positive straight leg raise on the right as well as his need to use a cane. (Doc. 10 at 20.) By way of example, Defendant argues Plaintiff has not shown that he meets the listing requirements because he "does not assert and the record does not show any 'motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss.'" (Doc. 14 at 20 (quoting 20 C.F.R. 20 C.F.R. Pt. 404, Subpt. P, App. 1).) In his reply brief, Plaintiff reiterates clinical and diagnostic findings but he does not address the lack of evidence cited by

Defendant. (*See* Doc. 15 at 2-3.) Thus, Plaintiff has not met his burden of showing that he meets *all* of the requirements of listing 1.04A and remand is not warranted on the basis alleged.

## C. *RFC Assessment*

Plaintiff cites numerous bases for his claimed RFC error. The Court will address each in turn.

## 1. <u>Cane Use</u>

Plaintiff first argues that the ALJ erred by failing to make a finding about his use of a cane, and the ALJ rejected Plaintiff's need to use a cane while standing without adequate explanation. (Doc. 10 at 9.) Defendant provides a two-pronged response: first, the ALJ's RFC assessment allows Plaintiff to "'continuously sit,' thus obviating his need for a cane" (Doc. 14 at 22 (citing R. 22)); second, Plaintiff's need for a cane is contradicted by the record and the ALJ had no duty to include it in the RFC (*id.*). In his reply brief, Plaintiff again points to the ALJ's failure to provide a valid explanation for rejecting the need to use a cane, but he does not address Defendant's first argument regarding the RFC assessment that Plaintiff was limited to light work where he would "continuously sit." (*See* Doc. 15 at 3.) The Court concludes the ALJ did not provide an adequate explanation for his finding regarding Plaintiff's medical need for a cane.

In his discussion of Plaintiff's osteoarthritis of the hips and knees, ALJ Cutter stated that Plaintiff

> testified that he uses a cane all the time .
> . . . However, the claimant's alleged
> medical need for a cane is found not
> persuasive. On September 29, 2014, Dr. Long
> stated that there is no evident joint
> deformity (Exhibit C9F/3 [R. 466]). Dr. Long
> also stated that the claimant's joints are
> stable and non-tender (Exhibit C9F/3 [R.
> 466]). There is no indication in the medical
> evidence of a record that the claimant has
> had any surgeries related to osteoarthritis
> of the hips and knees.

(R. 24.)

Plaintiff does not consider this a valid explanation for rejecting the medical need for a cane (Doc. 10 at 9; Doc. 15 at 3), and the Court agrees. First, pursuant to Third Circuit precedent, the ALJ was obligated to consider all probative evidence on the issue and explain the weight given to all probative exhibits. *Burnett*, 220 F.3d at 119-20; *Dobrowolsky,* 606 F.2d 403, 406; *Cotter*, 642 F.2d at 706-07. The ALJ did not do so in that he did not acknowledge Dr. Kunkle's opinion and Dr. Long's opinion that Plaintiff's need for a cane was medically necessary. (*See* R. 445, 470.) Second, his explanation encompasses the supposition that the medical need for use of a cane had to be predicated on joint deformity, non-stable and tender joints, or surgeries related to osteoarthritis of the hips and knees. (R. 24.) As no medical evidence supports the relationship inferred by ALJ Cutter, the Court cannot say his conclusion regarding Plaintiff's need for a cane is supported by substantial evidence. Insofar as the ALJ's discussion of the need for a cane is also predicated only on

27

osteoarthritis, he does not contemplate the effects of other impairments, including lumbar disc disease and obesity as well as Plaintiff's related documented complaints of pain, on Plaintiff's ability to ambulate effectively without an assistive device.

Defendant's argument that the RFC assessment allowing Plaintiff to "continuously sit" obviates his need for a cane (Doc. 14 at 22) relates to the harm associated with the ALJ's finding. The Court cannot consider this a harmless error because the RFC also allowed that Plaintiff could occasionally stand and walk (R. 22), Dr. Kunkle found that Plaintiff had to use a cane "while engaging in occasional standing/walking" (R. 450), and Dr. Long determined that Plaintiff's medically necessary use of a cane precluded him from carrying small objects with his free hand (R. 470). Without discussion of these matters, further consideration of harm associated with the ALJ's cane analysis is not warranted. Therefore, Plaintiff's claimed error regarding the ALJ's analysis of the medical need for a cane is cause for remand. Upon remand, full consideration of all probative evidence on the issue must be undertaken, including medical source opinions relative to the necessity of a cane, and reassessment of what appears to be the ALJ's lay opinion on the bases for finding the medical need for a cane not persuasive.

2.    **Concentration and Persistence Difficulties**

Plaintiff next asserts that the ALJ erred by failing to

include moderate restrictions in concentration, persistence, or pace, and social functioning in the RFC and the hypothetical posed to the VE. (Doc. 10 at 10.) Defendant responds that the ALJ adequately accounted for these limitations. (Doc. 14 at 23-27.) Because remand is required for the reasons discussed above, the Court concludes detailed discussion of the issue is not warranted and this aspect of the ALJ's decision should be addressed upon remand.

In brief, Plaintiff primarily relies on *Ramirez v. Barnhart*, 372 F.3d 546, 554 (3d Cir. 2002), for the proposition that limitation to routine, repetitive one to two step tasks does not reflect moderate restrictions in concentration, persistence, or pace. (Doc. 10 at 10.) Although Plaintiff's discussion of the issue is brief, the Third Circuit Court of Appeals clearly addressed the issue of the need to include limitations in concentration, persistence, or pace in an RFC assessment or VE hypothetical in *Ramirez*. 372 F.3d at 554. The Court explained that the limitation to one to two-step tasks identified in the VE hypothetical relied upon by the ALJ did not adequately encompass deficiencies in concentration, persistence, or pace which the ALJ had found: if the plaintiff often suffered from the identified deficiencies and they had been included in the hypothetical, the VE may have changed the answer regarding whether jobs existed in the national economy that the plaintiff could perform. *Id.*

Defendant responds that *Ramirez* is distinguishable because in *Ramirez* the claimant's limitations in concentration, persistence, or pace occurred "often" and here the limitations are considered moderate. (Doc. 14 at 23-24 (citing *Ramirez*, 372 F.3d at 552-55).) As evidence of the significance of the distinction, Defendant points to *McDonald v. Astrue,* 293 F. App'x 941, 946-47 (3d Cir. 2008), where a hypothetical limiting an individual to "simple routine tasks" was found sufficient to account for moderate limitations in concentration, persistence, or pace. (Doc. 14 at 24.)

Many courts have explained why *McDonald* is not persuasive, including this Court in *Jury v. Colvin*, Civ. A. No. 3:12-CV-2002, 2014 WL 1028439, at *11 n.21 (M.D. Pa. Mar. 14, 2014).

> The Commissioner relies on a non-precedential opinion, *McDonald v. Astrue*, 293 F. App'x 941 (3d Cir. 2008), to establish a distinction between "moderate" deficiencies and "often" having deficiencies in concentration, persistence, or pace. . . . In *McDonald*, the Third Circuit found that the plaintiff had "moderate" deficiencies in concentration, persistence, or pace, and noted in a footnote that *Ramirez* was distinguishable because the plaintiff in *Ramirez* "often" suffered from deficiencies in concentration, persistence, or pace. *McDonald*, 293 F. App's at 946 n.10. However, the panel did not address the recent change in the functional five-point scale used to assess concentration, persistence, or pace, which changed the term "often" to "moderate" at the third level of the five-point scale. *See Strouse v. Asture*, No. 07-4514, 2010 WL 1047726, at *6 (E.D. Pa. Mar. 19, 2010); *see*

30

> *also Colon v. Barnhart*, 424 F. Supp. 2d 805,
> 811 (E.D. Pa. 2006) (explaining the changes
> to the functional five-point scale). Several
> district courts have thus concluded that
> "moderate" on the new scale and "often" on
> the old scale are equivalent. *See Strouse*,
> 2010 WL 1047726, at *6; *Colon*, 424 F. Supp.
> 2d at 811; *Dynko v. Barnhart*, No. 03-CV-3222,
> 2004 WL 2612260, at *5 (E.D. Pa. Nov. 16,
> 2004) (considering "often" and "moderate"
> impairments equally on a five-point
> continuum). Moreover, the court held that
> the lack of record evidence for the
> plaintiff's alleged limitations was
> dispositive to his claim for social security
> benefits, not the distinction between the
> "often" suffering from deficiencies or
> "moderate" deficiencies. *McDonald*, 293 F.
> App'x at 946. Therefore, the court will
> apply *Ramirez* to the present case.

2014 WL 1028439, at *11 n.21. As in *Jury*, the Court finds *Ramirez* applicable to the facts of this case and concludes that the lack of specific consideration of concentration, persistence, or pace in the RFC and hypothetical to the VE should be addressed on remand.

## 3.  **Ability to Stoop**

Plaintiff argues that ALJ Cutter erred when he determined that Plaintiff could do sedentary work despite his finding that Plaintiff could never stoop because an inability to stoop can significantly erode the unskilled sedentary occupational base. (Doc. 10 at 11 (citing SSR 96-9p).) Defendant responds that SSR 96-9p acknowledges that there are some sedentary jobs that do not require stooping. (Doc. 14 at 27 (citing SSR 96-9p, 1996 WL 374185, at *6).) The Court concludes this claimed error is not cause for remand.

31

SSR 96-7p states that "a complete inability to stoop would significantly erode the unskilled sedentary occupational base and a finding that the individual is disabled would usually apply." 1996 WL 374185, at *8.

The Court finds it significant that SSR 96-7p uses the qualifying "usually," particularly in light of the fact that the ALJ relied on vocational testimony which included consideration of a hypothetical individual with Plaintiff's vocational profile who could perform sedentary work with certain limitations (*see* R. 50-51). Further, the Court concludes Plaintiff has not sufficiently developed his argument on this issue including his failure to address adequate specifics of his case. Therefore, the Court does not find error on the basis alleged.

### D. *Obesity*

As discussed above regarding ALJ Cutter's assessment of Plaintiff's use of a cane, the combined effects of Plaintiff's impairments, including obesity, should be considered on remand. Because remand is required and Plaintiff points to inadequacies in the consideration of obesity regarding sitting limitations (Doc. 10 at 12-14; Doc. 15 at 4-5), a more thorough analysis of the effects of Plaintiff's obesity should be undertaken upon remand.

### E. *Opinion Evidence*

Because this matter must be remanded for the reasons previously identified, extensive discussion of the claimed errors

related to opinion evidences is not needed.  The Court concludes that further consideration and analysis of opinions regarding physical impairments is warranted.  For example, ALJ Cutter's analysis of certain opinions is quite cryptic, such as the generic statement that "Dr. Kunkle's opinions that the claimant can never lift and/or carry up to 10 pounds . . . are not supported by the clinical signs and findings in the specialist's notes" (R. 25) where the record arguably contains evidence of the existence of related clinical signs (*see* Doc. 10 at 16 (citing evidence)).  In keeping with the Court's findings on the cane and obesity issues, further consideration should include evidence relevant to Plaintiff's use of a cane and postural limitations.

Regarding mental health opinions, the Court acknowledges Plaintiff's distinction between Dr. Caiazzo and CNP Marshall on the basis of the designation of who was an acceptable medical source at the time Plaintiff's claim was filed.  (Doc. 10 at 18.)  Upon remand the ALJ is to clarify his assessments of these providers' opinions.[4]  The ALJ is also directed to provide additional explanation for his conclusion that Dr. Caiazzo's findings of marked limitations are not supported by the clinical signs and

---

[4] Ms. Marshall's treating status is significant, *see* 20 C.F.R. § 404.1527(f)(1), and revised regulations (effective for claims filed after March 27, 2017) include her status as a licensed advanced practice nurse in the definition of acceptable medical source, *see* 20 C.F.R. § 404.1502(a)(7).  *See Jenkins v. Berryhill*, Civ. A. No. 3:17-CV-0211, 2017 WL 4012607, at *8-9 (M.D. Pa. Sept. 17, 2017).

findings in his notes.  (*See* R. 25.)

Plaintiff's conclusory statements regarding the ALJ's consideration of Dr. Williams' opinion based only on the assertion that he is a state agency consultant (Doc. 10 at 18) is insufficient to show error.  However, because the hierarchy and bases of the other mental health opinions are to be considered on remand, the significant weight assigned to Dr. Williams's opinion may also need to be addressed.

## F.   *Symptom Evaluation*

Based on the findings set out above, reevaluation of Plaintiff's symptoms will be undertaken on remand and the ALJ is directed to articulate specific findings related to alleged symptoms, including pain.

## V. Conclusion

For the reasons discussed above, the Court concludes Plaintiff's appeal is properly granted.  This matter is remanded to the Acting Commissioner for further consideration consistent with this opinion.  An appropriate Order is filed simultaneously with this Memorandum.

S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge

DATED: April 18, 2018